THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              Case No. 3:21-cr-00003-KGB-1

MARLON BEAL                                                 DEFENDANT

<u>ORDER</u>

Before the Court is defendant Marlon Beal's motion to suppress statement and physical evidence (Dkt. No. 23).  The United States filed a response in opposition to the motion (Dkt. No. 24).  The Court conducted a hearing on the motion April 29, 2022, at which evidence, testimony, and argument were presented (Dkt. Nos. 30–32).  For the following reasons, the Court denies Mr. Beal's motion to suppress (Dkt. No. 23).

I.      Factual Background

This Court, when considering the pending motion, reviewed the body camera video, testimony, and other evidence provided.  Based on the Court's review of the video, testimony, and other evidence, the Court recites this factual background.[1]

On October 9, 2019, Jonesboro Police Department ("JPD") officers (the "Officers") went to the home of Marlon Beal, 917 Mays Apartment A, Jonesboro, Arkansas, to conduct a parole search after receiving information from a confidential source that Mr. Beal was selling controlled substances out of the neighboring apartment, 917 Mays Apartment B.  No party disputes that Mr. Beal had a search waiver on file as a result of being on Arkansas state parole.  Upon arriving at

_____

[1]  At the time of these events in October 2019, the JPD did not have a policy in effect requiring body camera microphones to remain on once activated during an event.  All parties acknowledge that, during these events, certain body camera microphones were turned on and off by JPD Officers.

the address, the Officers knocked on the door of Apartment A, and nobody answered.  Meanwhile, Officer Dustin Smith observed Mr. Beal exiting the rear entrance of Apartment B.  The Officers made contact with Mr. Beal and informed him that that they were there to conduct a parole search and that they had received information that Mr. Beal was selling controlled substances from Apartment B.

Mr. Beal told the Officers that he had locked himself out of his apartment, Apartment A, and did not have a key.  Mr. Beal attempted to pry open the front door using a tool produced by Officer Chris Jefferson.  Mr. Beal also attempted to force open the back door of Apartment A.  Mr. Beal was unable to overcome the lock, even with the assistance of the Officers.

During this time, the Officers began to hear noises coming from Apartment B.  The Officers knocked on the door several times, yet again no one answered.  Mr. Beal denied exiting from Apartment B and told the Officers that he did not know who lived in Apartment B.  The Officers observed a realtor's lock on the front door and smelled the odor of marijuana emanating from the apartment.

Officer Jefferson at this point proceeded to kick down the rear door of Apartment B.  The Officers then entered Apartment B and observed three men sitting on the couch inside.  The Officers immediately ordered the men onto the ground and placed them in handcuffs.  The Officers then swept the apartment to ensure that there were no more occupants, and led the three men outside.

One of the three men who had been inside Apartment B persistently claimed to be the current tenant of the apartment, and Mr. Beal repeated the same information.  This man was later identified as Kendrayle Woods, and it was confirmed by the production of a signed rental agreement that Mr. Woods held a lease to rent Apartment B beginning on September 17, 2019.

At the scene, based on the Court's review of the body camera videos, Mr. Beal made the following statements before the warranted search of Apartment B:

> "This ain't my f*****' house n*****"

> "This ain't my f*****' house, how are you going to say this is my house?"

> "They can't search your house" (to Mr. Woods)

> "Y'all kick somebody else's house in, that ain't right"

> "You know you need a warrant for this person's house"

> "You know you need a search warrant for this house though"

> "Man, they can't search your house, simple as that" (again to Mr. Woods)

> "Man, I don't even stay there"

> "They had no business kicking your door in, they are supposed to kick that door in [referring to the door of Apartment A].  I stay at 917 Mays, Apartment A" (to Mr. Woods)

> "They cannot kick your apartment in, I am nowhere on your lease.  They are here to search for me.  They cannot kick your apartment in" (to Mr. Woods)

> "They kicked your door in for nothing man" (to Mr. Woods)

> "They know it is a whole other apartment"

After removing the three men from Apartment B, the Officers obtained a search warrant signed by Craighead County District Court Judge David Boling.  The Officers requested to search Apartment B for controlled substances, paraphernalia used to sell controlled substances, money derived from the sale of controlled substances, and firearms and ammunition.

In the Affidavit for Search Warrant, Officer Jefferson recited the facts establishing probable cause as follows:

> On 10/09/19, Investigators with the Street Crimes Unit responded to 917 Mays Road #A in reference to attempting to conduct a parole search of Marlon Beal in which at this time he exited from apartment "B" in which was believed to be vacant

3

due to a realator [sic] lock box on the front door of the apartment.  Investigators could smell a strong odor coming from apartment "B" at this time[,] and it was found that multiple subjects were inside the residence at which time it was cleared in liue [sic] of receiving the search warrant.

Based on the above listed facts and circumstances, the affiant is requesting a search warrant to be issued for the above-described residence.

(Dkt. No. 23-2).

Before the warrant was executed, the Officers conducted a parole search of Apartment A. During that search, Officer Nathan Ivy discovered three hydrocodone pills, and another Officer uncovered a bag containing marijuana.

After obtaining the warrant, the Officers effectuated a search of Apartment B.  Officer Jefferson located a loaded Kel-Tec rifle and 0.380 Diamond Black pistol in the kitchen cabinet, and Officers found in other cabinets multiple boxes of plastic sandwich bags, as well as three bottles of liquid promethazine syrup.  The Officers located 1.66 kilograms of methamphetamine inside a "Nike cooler bag," and in the side pocket of this same bag, Officers found 96 ecstasy pills. Officer Smith found a gray backpack behind an arcade gaming cabinet in the living room, and while going through the bag, Officer Jefferson found an unloaded blue and silver 9mm SCCY pistol, that later confirmed to be stolen, as well as another loaded gray 9mm SCCY pistol. Additionally, Officer Jefferson found two digital scales with methamphetamine/marijuana residue and a package containing empty sour packages, which was addressed to Mr. Beal.

Sometime during these events, Officer Bryan Bailey took Mr. Beal away from the apartments and into the yard where Officer Bailey began speaking to Mr. Beal.

As the two moved away from the apartments, Officer Bailey asked Mr. Beal, "You gonna let these boys go to jail?"  Mr. Beal adamantly stated that he had "nothing to do with nothing in there."  Officer Bailey then attempted to calm Mr. Beal down.  During the conversation, Officer

Bailey made the statement, "So I can set you down over here and whenever you're ready to talk, whenever you're ready for me to read you your rights or anything else, other than that we are going to have to take everybody and figure it out."

The conversation was then interrupted as Mr. Beal went with other Officers into Apartment B for the purpose of unlocking a safe with his fingerprint so that the Officers would not have to damage the safe to search it. After the safe was unlocked, Officer Bailey then took Mr. Beal back outside so that they could continue their conversation.

As Mr. Beal and Officer Bailey began speaking, Danielle Clark, Mr. Beal's girlfriend, cohabitant of Apartment A, and the mother of Mr. Beal's children, approached. Ms. Clark had not been present when the Officers originally arrived at Apartment A, and the body camera footage does not indicate precisely when she arrived on the scene. With Ms. Clark present, Officer Bailey stated, "The only way we are gonna let them out of cuffs and not go with you, we're gonna have to go through this. You know that." Mr. Beal replied, "What do you mean?" Officer Bailey then informed Mr. Beal that he must read aloud his *Miranda* rights, to which Mr. Beal agreed. After reading Mr. Beal his *Miranda* rights, Officer Bailey affirmed Mr. Beal's desire to answer his questions and to waive his right to an attorney.

Ms. Clark admitted during her testimony that no one threatened to arrest her. However, she also testified that she heard Officer Bailey say that Mr. Beal needed to talk to Officer Bailey or everyone would go to jail. According to Ms. Clark, she believed that they were talking about her, also, because she previously had been arrested in April for assault on an officer and resisting arrest due to her interfering with the Officers' executing a parole search waiver at Mr. Beal's home. According to Ms. Clark, she was charged with drug crimes, the same crimes as Mr. Beal. She spent one night in jail in April.

Officer Bailey then questioned Mr. Beal about the drugs, weapons, and paraphernalia found inside Apartment B.  Mr. Beal responded to Officer Bailey's questions, claiming that all the illegal items in the home belonged to him and to him alone.  He stated that the others in the apartment were not involved in any way with the illegal items uncovered.  After this admission, Officer Bailey then instructed the other Officers to release the three men who had been led outside from Apartment B from their handcuffs.  Officer Jefferson questioned Mr. Beal about the items in Apartment B in an effort to ensure that Mr. Beal was the right person to be charged with the items located and to avoid him taking a charge for everyone, if he was not in fact responsible for the items located.  According to Officer Jefferson, Mr. Beal's response when questioned about the number of guns in Apartment B was consistent with the number Officers located, including a stolen firearm about which Mr. Beal specifically was asked, and Mr. Beal accurately described the controlled substances located.

The Officers then allowed Mr. Beal a moment to collect and change his clothes in preparation for his trip to jail and to have a moment with Ms. Clark and his children in order to say his goodbyes.  Mr. Beal was later indicted and charged in this case with Possession with Intent to Distribute greater than 500 grams of Methamphetamine, Possession with Intent to Distribute Marijuana, Use of a Firearm in Furtherance of a Drug Trafficking Crime, and being a Felon in Possession of a Firearm.

At the hearing, Mr. Beal testified that he believed Ms. Clark might go to jail due to the small amount of drugs located in Apartment A, when it was a large amount of drugs located in Apartment B.

## II.    Voluntary And Involuntary Statements

### A.    Legal Standard

"No person shall. . . be compelled in any criminal case to be a witness against himself."

U.S. Const. Amend. V.  The Fifth Amendment does not prevent someone from voluntarily acting

as such a witness or from making voluntary statements, including confessions or otherwise

similarly incriminating statements.  These confessions or incriminating statements are admissible

in a court of law provided the statements were "free and voluntary" and not "extracted by any sort

of threats or violence" in accord with the Fifth Amendment.  *Brady v. United States*, 397 U.S. 742,

753 (1970) (internal quotation marks omitted).

> "A statement is involuntary when it was extracted by threats, violence, or express
> or implied promises sufficient to overbear the defendant's will and critically impair
> his capacity for self-determination."  *United States v. LeBrun*, 363 F.3d 715, 724
> (8th Cir. 2004) (internal quotation marks omitted).  We discern whether a
> confession is voluntary under the totality of the circumstances, examining both the
> "conduct of the officers and the characteristics of the accused."  *Id.*(internal
> quotation marks omitted).  "We consider, among other things, the degree of police
> coercion, the length of the interrogation, its location, its continuity, and the
> defendant's maturity, education, physical condition, and mental condition."  *Sheets
> v. Butera*, 389 F.3d 772, 779 (8th Cir. 2004).

*United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011).

Mr. Beal argues that his statement admitting to ownership of the contraband located in

Apartment B was not freely and voluntarily given (Dkt. No. 23, at 3).  Specifically, Mr. Beal

contends that his statement was an involuntary response to an improper threat to arrest Ms. Clark

by Officer Bailey.  Mr. Beal likens his conversation with Officer Bailey to the factual situation of

*U.S. v. Finch*, wherein the defendant involuntarily confessed after his mother was threatened with

arrest.  998 F.2d 349 (6th Cir. 1993).  In *Finch*, the Sixth Circuit Court of Appeals held that "threats

to arrest members of a suspect's family may cause a confession to be involuntary."  *Id.*, at 356.

Mr. Beal argues that he shares a relationship with Ms. Clark similar to the relationship the

defendant in *Finch* shared with their mother such that Mr. Beal's incriminating statements given in response to a similar threat to that made in *Finch* should be deemed involuntarily.

To determine whether Mr. Beal was subjected to any improper threats during his interaction with the JPD, the Court examines the body camera footage from Officers D. Smith, O. Smith, Ivy, Jefferson, and Bailey and all testimony provided during the April 29, 2022, hearing on the motion to suppress.

**B.      Analysis Of Statements**

The body camera footage and testimony at the hearing indicate that no Officers made any explicit statements threatening Ms. Clark.  Mr. Beal nonetheless asserts that, even though there were no direct threats made to Ms. Clark, his subjective fear that Ms. Clark would be arrested if he did not confess should render his confession coerced and involuntary.  The Court is not persuaded by this argument.

The Court concludes that Mr. Beal fails to demonstrate that at any time on October 9, 2019, a member of the JPD made any overt or implied threats to arrest Ms. Clark.  The Officers did, however, overtly threaten to arrest the three men found in Apartment B.  That day, there were only two statements made by Officer Bailey to Mr. Beal which could reasonably be construed as a threat toward anyone.  The first statement was:  "So I can set you down over here and whenever you're ready to talk, whenever you're ready for me to read you your rights or anything else, other than that we are going to have to take everybody and figure it out.  But you know why we are here; know why we are in that apartment."  The second statement was:  "The only way we are going to let them out of cuffs and not go with you, we're gonna [sic] have to go through this."

It is not clear from the body camera footage if Officer Bailey's first statement was made before or after Ms. Clark arrived at the scene.  As a result, it is unclear from the evidence whether

the "everybody" in Officer Bailey's statement could have referred to Ms. Clark.  However, when Officer Bailey stated:  "You know why we are here, know why we are in that apartment," it is clear that Officer Bailey was referencing a single apartment and that the apartment in question was Apartment B, rather than Apartment A.

Additionally, it is unclear from the evidence whether Mr. Beal was even aware at the time of this conversation with Officer Bailey that contraband had been found in Apartment A.  Mr. Beal testified that, because they were the only two officers with whom he felt comfortable talking, Mr. Beal spoke exclusively with Officers Bailey and Jefferson.  Neither of these Officers mentioned the drugs found in Apartment A at any point.  Neither Officer Bailey nor Officer Jefferson specifically mentioned Ms. Clark during any of their conversations.  There is no suggestion by anyone before the Court that Ms. Clark was associated with Apartment B in any capacity.

For all of these reasons, the Court concludes that "everybody" in this context referred to the three individuals found in Mr. Wood's apartment, Apartment B, when the Officers discovered the contraband.  From the evidence, this statement was not intended to group Ms. Clark in with "everybody," nor does the objective evidence before the Court support the contention that Mr. Beal understood the statement to have done so.

The second statement by Officer Bailey that could be construed as a threat to make an arrest and potentially coerce Mr. Beal was:  "The only way we are going to let them out of cuffs and not go with you, we're gonna [sic] have to go through this. You know that?"  The Court understands this statement to reference the need for Officer Bailey to read Mr. Beal his *Miranda* rights and to interrogate him about the contraband before the Officers could let "them" go.  This statement also cannot reasonably be construed to have referred to Ms. Clark because it specifically threatens only those currently wearing handcuffs with arrest.  At the time this statement was made,

Officer Bailey spoke with Mr. Beal while Ms. Clark was present.  Mr. Beal was mere inches from Ms. Clark and could observe that she was not wearing handcuffs and, therefore, not among those threatened with arrest.  The objective evidence before the Court does not support the contention that Mr. Beal understood the statement to have done so.

For these reasons, the Court concludes that neither of these two statements made by Officer Bailey can reasonably be construed as a threat to arrest Ms. Clark.

Mr. Beal argues that Officer Bailey genuinely and improperly threatened to arrest Ms. Clark and that this threat coerced Mr. Beal to answer the officer's questions, likening the facts of this case to *Finch*.  998 F.2d 349.  Under *Finch,* "threats to arrest members of a suspect's family may cause a confession to be involuntary."  *Id.*, at 356.  The Court acknowledges that, although Mr. Beal and Ms. Clark may not be married, they live together and have multiple children.  The Court concludes that there is evidence that they share a family relationship.  There is no evidence before the Court that Mr. Beal shared a similarly close family relationship with Mr. Woods or either of the other two individuals detained in Apartment B; the Court acknowledges there is some record evidence that Mr. Woods is a cousin of Ms. Clark, not Mr. Beal.  That Ms. Clark was not threatened and that there is no evidence before the Court that Mr. Beal was family to anyone in Apartment B distinguishes this case from *Finch*.

Mr. Beal also asserts that, even if no direct threats to arrest Ms. Clark were made, he was convinced Ms. Clark would be arrested if he did not confess and that his belief was such a powerful motivating factor that it coerced him to incriminate himself involuntarily.  Based on Court's review of the body camera footage, at no point did Mr. Beal vocalize any concerns about Ms. Clark being arrested, nor did he show any outward signs of having his will overborne during his brief interrogation by Officer Bailey or outward signs of concern regarding the possibility of Ms. Clark

being detained. In fact, Mr. Beal is seen laughing and joking with the Officers whom he now alleges had completely overborne his will. The totality of the circumstances, based on the conduct of the Officers and Mr. Beal, leads the Court to conclude that Mr. Beal's will was not overborne and that his statement was voluntary.

Pursuant to *Brady*, a statement is involuntary when "extracted by any sort of threats or violence," *Brady v. United States*, 397 U.S. at 753, meaning that when a person has been threatened and when they respond to that threat by making an incriminating statement, the statements should be suppressed. If this Court were to accept Mr. Beal's argument, the Court would be suppressing incriminating statements not because of quantifiable misconduct by law enforcement but instead because of unpredictable, speculative, and subjective mental states of the subjects of police investigations. The Court essentially would be required to suppress incriminating statements made by a suspect whenever the suspect articulates a perceived threat sufficient to overbear the suspect's will and compel self-incrimination, regardless of any objectively reasonable basis to believe that a threat was ever actually made.

Interacting with law enforcement is often a stressful, nerve-wracking endeavor for citizens, most of whom have very little understanding of police procedures. When an individual is involuntarily interrogated by law enforcement, it is entirely reasonable that any number of distressing possible future scenarios may play themselves out in that person's head and potentially impact the choices made by that person going forward. Even under those circumstances, it is unreasonable to suggest that, when an officer has engaged in legitimate conduct and permissible questioning, the fruits of that policework should be suppressed because the suspect developed a perceived but unsubstantiated fear about what law enforcement was going to do. Controlling Fourth Amendment law does not require suppression under these circumstances.

The Court concludes that at no point did any Officers threaten to arrest Ms. Clark.  The statements made that could be construed as a threat to arrest can only reasonably be interpreted by the Court to apply to the occupants of Apartment B, and Mr. Beal's behavior on the day in question does not indicate that he interpreted these statements any differently.  Even if Mr. Beal did interpret these statements differently as he testified, for the reasons explained, the Court declines to recognize his subjective perception as a basis to conclude that Ms. Clark was legitimately threatened.  The only people threatened with arrest if Mr. Beal did not talk to law enforcement on the scene after being given his *Miranda* warning were Mr. Woods and the other two occupants of Apartment B.

The Court denies Mr. Beal's motion to suppress on this basis and determines his statements should not be suppressed.

### III.   Standing To Challenge Search

The Fourth Amendment to the United States Constitution provides:  "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV.  Under the Fourth Amendment, a person has been "searched" when "an actual (subjective) expectation of privacy" has been violated and that expectation is "one that society is prepared to recognize as 'reasonable.'"  *United States v. DE L'Isle*, 825 F.3d 426, 431 (8th Cir. 2016) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)).  To demonstrate a reasonable expectation of privacy under *Katz*, a defendant is required to make "a showing of both a subjective expectation of privacy and an objective expectation of privacy that society recognizes as reasonable."  *Id*., at 432 (citing *Katz*, 389 U.S. at 361).  When a defendant can demonstrate a

reasonable expectation of privacy in their person or property and that a search has taken place, this person has "standing" to challenge the validity of the search. *United States v. Nabors*, 761 F.2d 465, 468 (8th Cir. 1988).

For Mr. Beal to challenge the validity of the Officer's warrantless entry into Apartment B or the legality of the search warrant subsequently issued, Mr. Beal must first demonstrate that he had both an objective and subjective expectation of privacy in Apartment B at the time the search took place and, therefore, standing to challenge the legality of the search.

### A.      Legal Standard

"Because Fourth amendment rights are personal, a person challenging a search warrant must demonstrate that he or she has a legitimate expectation of privacy in the area searched." *United States v. Wiley*, 847 F.2d 480, 481 (8th Cir. 1988). "Factors relevant to the determination of standing include:  ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000).  Determining whether a defendant has standing to challenge a search requires a careful balancing of these factors to decide if the totality of the defendant's property and privacy interests in the area searched are sufficient to establish a reasonable expectation of privacy. *Id.*

### B.      Analysis Of Standing

In his motion to suppress, Mr. Beal asserts that he had a reasonable expectation of privacy in Apartment B and that he has standing to challenge the validity of the issued search warrant and entry of Apartment B (Dkt. No. 23, at 5–10).  He argues that he was sufficiently connected to

Apartment B to articulate a reasonable expectation of privacy in the apartment because he had unlimited and unrestricted physical access to Apartment B by key; he stored personal property like clothes, shoes, and mail in Apartment B; and he would occasionally spend the night in Apartment B (*Id.*, at 8).  The Court observes that there was conflicting testimony on this point.  Mr. Beal admitted that, if Mr. Woods was away, Mr. Beal would access a key to Apartment B through the realtor's lockbox on the doorknob.  Mr. Beal admitted that, if Mr. Woods was home, Mr. Beal would knock on the door so that Mr. Woods could let him inside.

To resolve his motion to suppress, however, the Court need not determine whether these possessory and property interests were sufficient to provide Mr. Beal with the reasonable expectation of privacy sufficient to confer standing to challenge this evidence.  Instead, the Court determines that Mr. Beal's repeated statements disassociating himself from Apartment B prior to the search constituted an abandonment of any expectation of privacy which he may have previously possessed inside the apartment.  As a result, Mr. Beal lacks standing to challenge the search and the warrant issued for the search of Apartment B.

*United States v. Camberos-Villapuda*, 832 F.3d 948, 951–52 (8th Cir. 2016), is instructive. In *Camberos*, the defendant moved to suppress methamphetamine, drug paraphernalia, two handguns, and $80,000, alleging that the warrantless search of a house and a Ford Expedition which uncovered this evidence was a violation of his Fourth Amendment rights. *Id.*  Mr. Camberos argued that, as an overnight guest in the home, he had both an objective and subjective expectation of privacy in the home and the Ford Expedition.  It is a well-established principle of Fourth Amendment jurisprudence that overnight guests have a reasonable expectation of privacy. *Minnesota v. Carter*, 525 U.S. 83, 89 (1998).  In *Camberos*, it was undisputed that Mr. Camberos was an overnight guest of the home, and the search of the home was indeed conducted without a

warrant.  832 F.3d at 951.  The Eighth Circuit determined that, when Mr. Camberos voluntarily abandoned his property interest in the home and the truck, he simultaneously renounced any previously held expectation of privacy in that property.  832 F.3d at 952.  Accordingly, the Eighth Circuit Court of Appeals rejected Mr. Camberos' challenge of the search concluding that he lacked standing to do so.  *Id.*, at 951–52 (holding that "[w]hen a person voluntarily abandons his interest in property he relinquishes any expectation of privacy and may not challenge a search of that property based on the Fourth Amendment.") (quoting *United States v. Caballero–Chavez*, 260 F.3d 863, 866–67 (8th Cir. 2001)).

The *Camberos* court explained that whether a defendant voluntarily abandoned his interest in the property to be searched is determined based on the totality of the circumstances, with specific attention on whether the defendant denies ownership of the property and physically relinquishes the property.  832 F.3d at 952.  In that case, Mr. Camberos gave officers conflicting information regarding whether he was in fact working on the Ford Expedition.  *Id.*, at 950.  Mr. Camberos also told the officers that he was not living at the house, that he had not been inside the house, and that he did not know the owner of the house.  *Id.*  The Eighth Circuit reasoned that these statements disclaiming any connection to the house and truck served as abandonment of both the property and any privacy interests Mr. Camberos held in it, despite no physical abandonment having taken place.  *Id.*, at 952.  That Mr. Camberos was lying to the officers or that he admitted after the search that he was in fact an overnight guest of the home and the owner of the truck did not matter because "[a]bandonment is determined based on the objective facts available to the investigating officers at the time they conducted the challenged search.  It does not depend on the defendant's knowledge or intent."  *Id.*, at 952.  At the time of the warrantless search, Mr. Camberos had explicitly renounced any property or privacy interest held in the home, and the totality of the circumstances

15

did not indicate otherwise.  The officers had no reason to believe that Mr. Camberos was staying in the home overnight or that he was the owner of the truck when Mr. Camberos' statements explicitly gave the officers cause to believe the opposite.  As a result, the Eighth Circuit determined that the officers could not have concluded that Mr. Camberos had a reasonable expectation of privacy in either the home or the truck prior to the search.  *Id.*

The factual circumstances in *Camberos* bear a strong resemblance to the case at hand.  Like Mr. Camberos, Mr. Beal abandoned his privacy interest in Apartment B by repeatedly renouncing any connection to the apartment prior to the search taking place.  After the door to Apartment B was kicked in, but before the search warrant was executed and any of the evidence in Apartment B was located, Mr. Beal made multiple declarations that he was in no way connected to Apartment B, and these statements are audible on the body camera footage.  These statements serve as disavowals of Mr. Beal's relationship to Apartment B.

Here, prior to the search, Officers had little to no information suggesting that Mr. Beal had an expectation of privacy in Apartment B.  It is true that Officers had received a tip that Mr. Beal was selling drugs out of Apartment B, and Officers had also witnessed Mr. Beal exiting the back door, despite Mr. Beal's protests that he had not.  However, Officers were aware that Mr. Beal did not reside in Apartment B, and Officers were under the impression the apartment was vacant based on the realtor's lockbox on the door.

The Court finds that the totality of the circumstances would not lead a reasonable officer to conclude that Mr. Beal had any privacy interest in Apartment B.  Mr. Beal's repeated, unequivocal disavowals of any property or privacy interests in Apartment B serve as effective abandonment of any interests he may have had.  Because any interest previously held was abandoned, Mr. Beal has not demonstrated a reasonable expectation of privacy in Apartment B

and has no standing to challenge the validity of the search or search warrant.  The Court denies Mr. Beal's motion to suppress the physical evidence obtained from the search.

The Court acknowledges Mr. Beal's assertion that the warrant was invalid (Dkt. No. 23, at 5–6).  However, because this Court concludes that Mr. Beal lacks standing to challenge the search and search warrant, the Court need not reach the legality of the warrant to resolve the pending motion to suppress.

IV.     **Conclusion**

For the foregoing reasons, the Court denies Mr. Beal's motion to suppress (Dkt. No. 23).

It is so ordered this 30th day of June, 2022.

_____
Kristine G. Baker
United States District Judge

17